# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 17, 2011 Session

## STATE OF TENNESSEE v. KRISTEN A. WILSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1020     Monte Watkins, Judge**

―――――――――

**No. M2010-02381-CCA-R3-CD - Filed August 19, 2011**

―――――――――

The defendant, Kristen A. Wilson, presents for our review a certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2). The defendant pleaded guilty to driving under the influence, per se. As a condition of her guilty plea, the defendant reserved a certified question of law challenging the admissibility of her blood sample based on the two-hour admissibility limit. Following our review, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

David L. Raybin, Nashville, Tennessee, for the appellant, Kristen A. Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kyle Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

On April 27, 2007, a Davidson County grand jury indicted the defendant, Kristen A. Wilson, for one count of driving under the influence, one count of driving under the influence per se, and one count of assault. On August 10, 2007, the defendant filed a motion to suppress the blood alcohol analysis arguing that the officer administered the test beyond the two-hour time limit imposed by Tennessee Code Annotated section 55-10-406. The trial court held an evidentiary hearing on the motion to suppress on January 9, 2008.

At the hearing, Metropolitan Nashville Police Department Officer Joseph Jakes identified the defendant and stated that he arrested her on July 14, 2006. Officer Jakes first contacted the defendant while he and another officer, Officer Wallace Taylor, were standing at the intersection of Seventeenth Avenue South and Wedgewood Avenue. The defendant was traveling "up Seventeenth Avenue South towards Wedgewood, and [Officer Jakes] observed she didn't have her seatbelt on."

After observing the defendant not wearing her seatbelt, Officer Jakes instructed the defendant to pull over and approached the vehicle that she was driving. Officer Jakes testified that when he began speaking with the defendant he "noticed there was an extreme odor of alcoholic beverage coming from her expelled breath." Officer Jakes told the defendant to exit the vehicle to perform the field sobriety tests. After the defendant completed the tests, Officer Jakes determined that she was under the influence and arrested her for driving under the influence (DUI).

Officer Jakes requested that the defendant submit to a breath alcohol test, and the defendant agreed. He observed the defendant for twenty-four minutes during which time she blew three insufficient samples. The insufficient samples did not produce a "readout," so Officer Jakes asked the defendant to submit to a blood alcohol test. The defendant agreed to the test.

Officer Jakes took an inventory of the defendant's vehicle and had it towed. When he returned to his vehicle, the defendant had passed out in the backseat. Officer Jakes called an ambulance and additional officers to the scene. The ambulance arrived and transported the defendant to the hospital. Officer Taylor followed the ambulance, and Officer Jakes went to obtain warrants. Officer Jakes said that the defendant's passing out and their having to wait for an ambulance delayed his investigation.

Officer Jakes testified that he completed the DUI testing report form and had entered 1:15 a.m. on the form as the time he initially observed the defendant's vehicle. He also completed an arrest report on which he indicated that he had arrested the defendant at 1:30 a.m. Officer Jakes stated that the video recorded the stop and displayed the time. He testified that, as far as he knew, the time displayed on the tape was accurate. He was not aware at what time the hospital staff drew the defendant's blood.

Between the time he stopped the defendant and the time the video showed her getting into his police car, Officer Jakes was speaking with the defendant about "where she had been, how much alcohol she had consumed, and . . . performing the field sobriety tests." He said that once he conducted the field sobriety tests and determined that the defendant was intoxicated, he told her she was under arrest, put handcuffs on her, and placed her in the back

seat of his vehicle. He said that the defendant was not physically restrained while he conducted the field sobriety tests and questioned her about how much she had drunk.

On cross-examination, Officer Jakes testified that another police vehicle was at the intersection of Seventeenth Avenue South and Wedgewood Avenue when he stopped the defendant. Officer Jakes was on the right side of Seventeenth Avenue South facing Wedgewood Avenue when he observed the defendant and her passenger were not wearing seatbelts. He said that he used his flashlight to look inside the vehicle. According to Officer Jakes, the defendant's vehicle did not have tinted windows, and the area where the defendant stopped was well lit.

Officer Jakes stated that if the defendant had left the scene while he was talking to her, he would have arrested her for resisting the stop. He agreed that the defendant's "freedom of movement and her ability to say, 'I'm not going to stop,' had been terminated at that point by [his] flagging her down[.]" Officer Jakes stated that he wrote that he stopped the defendant at 1:15 a.m. on the "132 form in paragraph four" and testified at the preliminary hearing that he stopped her at 1:15 a.m.

Officer Jakes testified that he would manually set the time on the camera in his police vehicle "if the battery die[d], or something like that." He stated that simply turning off the vehicle would not affect the time. When Officer Jakes "turn[ed] the camera on, the date and time would display and . . . if that time . . . was in [sync] with every other clock [he] had, . . . [he] just left it alone. He assumed that he got the 1:15 stop time from the recording taken by the vehicle's camera. Officer Jakes explained that he usually estimated the time of the arrest.

Officer Jakes further explained that when administering a breath test, the machine allows a suspect three chances to blow into the machine. If they are unable to give a sufficient sample after three tries, the machine purges and will not allow the officer to administer another test for twenty minutes. After twenty minutes, the suspect may try again. Officer Jakes did one "twenty-minute observation" of the defendant during which he changed the mouthpieces on the machine. Officer Jakes agreed that he called the ambulance because the defendant had passed out, but he did not remember telling the ambulance dispatcher that he had "a female who was having a panic attack and passed out[.]" He said that when the fire department arrived to the scene, they observed the defendant and said that she was intoxicated. Officer Jakes stated that because he did not go to the hospital with the defendant, he was unaware that the hospital diagnosed her with catatonia.

Officer Jakes testified that Officer Wallace Taylor accompanied the defendant to the hospital. Officer Taylor brought Officer Jakes the defendant's blood sample kit. Officer Jakes identified the Alcohol Toxicology Request form and stated the form listed him as the

requesting officer although Officer Taylor signed it. The form shows that a registered nurse at the hospital collected the defendant's blood sample on July 14, 2006 at 3:25 a.m. Officer Jakes stated that the nurse placed the date and time that she collected the sample on the form, and he did not have independent knowledge whether the date and time were correct. Officer Jakes identified the Tennessee Bureau of Investigation ("TBI") Crime Lab report for this case, which showed that the defendant's blood was collected on July 14, 2006 at 3:25 a.m. When asked whether he took the blood test "two hours and ten minutes after the initial detention," Officer Jakes answered "Yes, sir." However, on redirect examination, Officer Jakes testified that the 1:15 a.m. time listed on the 132 report reflected the time that he initially observed the defendant and made contact with her without handcuffing her or physically detaining her.

The trial court denied the motion to suppress in a written order entered January 31, 2008. The defendant filed a motion to clarify the court's ruling on February 13, 2008. The motion to clarify asked the court to explain how it interpreted the phrase "initial detention or arrest," which is contained in the statute under which the defendant was charged. In response to the defendant's motion to clarify the trial court held another hearing, on March 27, 2008, during which the trial judge commented about the court's order. The court stated that it

> interpret[ed] the statute to mean either/or. You can count the time from the time of arrest, which [it] thought was the more critical time period, rather than the initial detention, because a person is not under arrest on the initial detention. But once a person is placed under arrest, then, the time begins to run. And so [it] looked at the plain language of the statue and ruled essentially based upon that.

The trial court further stated that it used the time of arrest because it "was the most important portion of the stop, since the person had been placed under arrest."

On May 22, 2008, the defendant entered a conditional guilty plea reserving as a certified question "whether the two-hour admissibility limit begins to run from the moment of 'initial detention' or does it begin to run at the moment of 'such person's arrest.'" On appeal, this court concluded that the trial court's initial order certifying the question was not sufficiently incorporated into the judgment and dismissed the appeal. The Tennessee Supreme Court denied review of this court's decision. The defendant filed for post-conviction relief, and the post-conviction court granted relief and vacated the defendant's conviction on November 3, 2010. On November 3, 2010, the defendant entered another conditional guilty plea again reserving as a certified question "whether the two-hour admissibility limit begins to run from the moment of 'initial detention' or does it begin to run

at the moment of 'such person's arrest.'" At the guilty plea hearing the state reported to the court that had the matter gone to trial, the facts would have been as follows:

> [O]n July 14th, 2006 at one-fifteen in the morning Officer Jakes was on patrol when he saw Ms. Wilson on Wedgewood Avenue and Seventeenth Avenue here in Davidson County. She was driving a vehicle but was not wearing a seat belt, so he made a stop.
>
> He smelled an odor of alcohol coming from her breath when he approached her. He asked her to perform field sobriety [tests], which she did and she indicated clues of impairment. She had bloodshot red, and watery eyes and was unsteady on her feet. She admitted drinking one drink and taking some medications.
>
> At that time she was placed in custody for DUI. She was read the implied consent law. She advised that she understood. She agreed to a breath test. She blew three insufficient samples so Officer Jakes requested a blood test and she agreed to that. And the blood test was drawn. And it came back as a [.16%], which is over the legal limit.

The trial court accepted the defendant's plea and sentenced her to serve eleven months and twenty-nine days in jail, all suspended except forty-eight hours; $350 fine; alcohol safety school; loss of driving privileges for one year; and twenty-four hours of community service work.

## Analysis

The defendant presents for our review, the single issue of whether the bright line two-hour admissibility limit contained in Tennessee Code Annotated section 55-10-406(a)(1) begins to run at the moment of the initial detention or the later arrest. The defendant argues that the two-hour limit begins to run at the initial detention, and thus, the blood sample in her case is inadmissible because it was drawn more than two hours after her initial detention. The state responds that "[a] plain reading of the statute reveals that the legislature intended the two-hour time limit for blood alcohol testing to run from [either] the time of the initial detention or from the time of arrest."

"When evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, the court on appeal must uphold the trial court's findings of fact unless the evidence preponderates otherwise." *State v. Williams*, 185 S.W.3d 311, 314 (Tenn. 2006). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of

fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). However, appellate review of a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a *de novo* review. *See State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

The trial court's ruling in this case was based on the interpretation of the two-hour admissibility limit contained in Tennessee Code Annotated section 55-10-406(a)(1). "When the meaning of a statute is in question, we rely upon well-established canons of statutory construction." *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008). "This Court may look to the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment" to determine the intent of the legislature when confronted with an issue of statutory interpretation. *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005) (internal quotation marks and citation omitted). We must also, however, "ascertain and carry out the legislative intent without unduly restricting or expanding the statute's coverage beyond its intended scope." *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993). "[W]e presume that every word in the statute has meaning and purpose and should be given full effect if the obvious intent of the General Assembly is not violated by so doing." *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010) (citing *Larsen–Ball v. Ball*, 301 S.W.3d 228, 232 (Tenn. 2010)).

It is a basic rule of statutory construction that, in the absence of ambiguity, we give statutory terms their natural and ordinary meaning, and we will construe statutes that deal with the same subject matter together where possible. *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). Our supreme court has held that:

> [t]he most basic principle of statutory construction is to ascertain and give effect to legislative intent. Legislative intent is to be ascertained whenever possible from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language. If the legislative intent is expressed in a manner devoid of contradiction and ambiguity, there is no room for interpretation or constructions, and courts are not at liberty to depart from the words of the statute. Where the language contained within the four corners of the statute is plain, clear and unambiguous, the duty of the courts is simple and obvious, "to say sic lex scripta, and obey it."

*Hawks v. City of Westmoreland*, 960 S.W.2d 10, 16 (Tenn. 1997).

At the time of the defendant's arrest, the relevant statute in this case, Tennessee Code Annotated section 55-10-406(a)(1), provided that

> (a)(1) Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of such person's blood, or both such tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe such person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating the provisions of §§ 39-13-106, 39-13-213(a)(2) or 39-13-218. *For the results of such test or tests to be admissible as evidence, it must first be established that all tests administered were administered to the person within two (2) hours following such person's arrest or initial detention.*

Tenn. Code Ann. § 55-10-406(a)(1) (2006) (repealed in part by Public Acts of 2008, Ch. 957, § 2, effective Jan. 1, 2009) (emphasis added).

Because the result of the defendant's blood alcohol test was the only evidence supporting her conviction, whether the two-hour time limit commences at the initial detention or arrest is dispositive of the defendant's case. At the suppression hearing, the trial court interpreted that statute so that the later event governed. Accordingly, the court found that the two-hour limit commenced when Officer Jakes arrested the defendant and the blood sample that the hospital drew was timely and admissible. We disagree. As the defendant argues in her brief, if we were to rule that the two-hour rule commenced at arrest, the rule could easily be avoided by delaying arrest. Additionally, the legislature intended the statute to criminalize driving while under the influence, therefore, it would logically follow that the crucial event is the initial detention, which is closest in time to the crime.

Moreover, our analysis must include the rule of statutory construction that requires us to strictly construe criminal statutes in favor of the defendant. *State v. Alford*, 970 S.W.2d 944, 947 (Tenn. 1998) (citing *State v. Odom*, 928 S.W.2d 18, 30 (Tenn. 1996)). Construing ambiguities in criminal statutes in favor of the defendant has long been a general rule of statutory construction. *State v. Blouvett*, 904 S.W.2d 111, 113 (Tenn. 1995) (citing *Key v. State*, 563 S.W.2d 184, 188 (Tenn. 1978)). The state argues that either event, the detention or arrest, could have triggered the two-hour time limit. However, the state's argument that either event governs the commencement of the two-hour period would render the statute unclear or inexact because the legislature did not make a choice between alternatives. Thus, if we accept the state's argument that the two-hour admissibility limit begins to run at *either*

detention *or* arrest, the statute is ambiguous, and we must construe it in favor of the defendant. We conclude that the two-hour admissibility limit in the defendant's case began to run at 1:15 a.m., when Officer Jakes initially detained her. Therefore, the blood sample taken at 3:25 a.m., more than two hours after the initial detention, was inadmissable. Accordingly, we consider the defendant's conviction for DUI per se void and reverse the defendant's conviction.

## Conclusion

Based on the foregoing and the record as a whole, we reverse the judgment of the trial court, vacate the defendant's conviction and sentence, and dismiss the charges against the defendant.

_____
J.C. McLIN, JUDGE